GReen, J.,
delivered the opinion of the court.
The plaintiff in error was indicted aftd convicted, in the circuit court of Sumner county, for the murder of John W. Lau-derdale, his master. A motion was made for a' new trial, which was overruled, and the prisoner appealed to this court.
On the trial of the prisoner, the following persons were de- *233 dared to be competent jurors; were proposed to the prisoner, and were by him peremptorily challenged, viz, Gray Douglass and Richard Douglass ; who stated that they had not formed an opinion of the guilt or innocence of the prisoner, except from rumor. James P. Taylor stated, that the sons of his wife, by a former marriage, were second cousins to the deceased, John W. Lauderdale, and his wife is still living. Anderson King stated, that he has had different accounts of the case, contradictory of each other. He formed an opinion of the prisoner’s guilt in this case upon the first account. He had then heard a different account, and had no opinion; has heard none of the witnesses speak of it; has now no settled opinion as to the guilt or innocence of the prisoner. Alfred King stated, he has no opinion as to the guilt or innocence of the prisoner; has heard different tales about the case, and has had several opinions predicated on these different tales; the tales were materially different; dont know that any of these tales were true; thinks they were founded upon public rumor; never talked with a man acquainted with the circumstances. M. D. Redditt stated, from what he had heard he supposed the negro was guilty; has not heard enough of the circumstances of the case to form a settled opinion; has now, no settled opinion.
All-the foregoing persons were pronounced competent jurors by the court; to which several opinions the defendant excepted. The defendant challenged each of the person above named, and all his challenges were exhausted before a jury was obtained.
Before the jury was made up, and after nine jurors had been selected, the prisoner filed an affidavit, alleging that after three days trial, the court had failed to get a jury; that great excitement existed against him in the public mind; that an impartial trial could not be had in the county; that many persons had obtruded their opinions during the effort to get a jury; stating that the prisoner ought to be hung, thus increas *234 ing the excitement against him; and he therefore prayed the court to change the venue to some other county free from the like exceptions.
The court refused to change the venue on this affidavit, and continued the effort to get a jury. On the exhaustion of each panel subsequently summoned by the Sheriff, the prisoner renewed this motion for a change of venue, which motion was in each case, overruled.
At the time the prisoner’s affidavit was filed, one hundred and sixty-five jurymen had been presented, of whom the prisoner challenged twenty-seven, the State challenged six, nine had been selected, and the remaining number were disqualified, having formed an opinion.
The prisoner was put to the bar on Tuesday, and the court on that day commenced the selection of a jury. The entire panel was made up on Friday, two hundred and twelve men having been presented during the effort to get a jury.
The prisoner excepted to the several opinions of the court, overruling his various motions for a change of venue. It is now insisted by the counsel for the prisoner, that the court erred in deciding that Gray Douglass, Richard Douglass, James B. Taylor, Anderson King, Alfred King, and M. D. Red-ditt, were competent jurors.
We do not think the court erred in putting to the prisoner either of the jurors before named. Gray and Richard Douglass had not formed an opinion except from rumor.
It is the settled law of this court, distinctly restated in the case of Moses vs. The State, 10 Hum. Rep., that an opinion formed upon rumor, or report, not relied on as true, will not disqualify the juror.
James P. Taylor’s step-sons, are cousins to the deceased. This does not disqualify the juror. It does not make him of kin to the deceased. Anderson King had formed an opinion of the prisoner’s guilt on hearing the first account of the affair, but *235 he had since heard a different account, and had no opinion. He had heard none of the witnesses. Alfred King has had several opinions, having heard different tales, but has now no opinion. M. D. Redditt supposed the negro guilty; from what he had heard; had not heard enough of the case to form a settled opinion; has now no settled opinion.
The state of mind of these three jurors is very similar, and the question of their competency must depend upon the same rule, applicable to each.
This court held, in McGowetís case, and again in Moses’ case, above referred to, that if a juror has formed an opinion, that is, “has made up his mind,” as tó the guilt or innocence of the accused, either from personal knowledge of the facts, or upon information derived immediately from witnesses, or others professing to know the circumstances of the case, he is incompetent ; but an opinion formed on rumor merely, does not disqualify the juror.
Now, neither of these three jurors had heard the witnesses, or had acquired any just knowledge of the facts and circumstances of the case. Two of them had heard different statements, and had changed their first impressions, and had then no opinion. Mr. Redditt had not heard enough of the circumstances to form an opinion, and had no settled opinion. It is evident they had only the impressions which rumor creates, and which are changed by a succeeding rumor; impressions which the jurors do not rely upon as correct, and which they say, is “no opinion,” or “no settled opinion.”
The juror, in the case of Moses vs. The State, stated, “that from rumor he had formed an opinion, touching the accusation against the prisoner, upon which he was called to pass. The court then asked him, if his information was from any of the witnesses, or persons who knew the facts ? He said he did not know — or even know the witnesses in the cause. He was further asked if he could do justice to the prisoner, or *236 if bis mind was anywise biased ? The answer was, if the proof turned out differently from rumor, he could do justice to the prisoner.”
In that case, the court understood the statement of the juror to mean, “that he had in his mind, not a mere hypothetical opinion, or loose impression; but an opinion so fixed that it would require evidence to remove it, and which was not to be changed, or yielded, unless in his own language, the proof turned out differently from rumor.”
In the case before us, no such fixed opinion had been formed by any of the jurors whose fitness we are examining.
The “impressions” had been so “loose,” that every varying rumor changed them, — so that they were found without opinions. In Moses’ case, the juror had an opinion,to be removed only by evidence. In this case, neither of the jurors had an opinion ; and the facility with which succeeding rumors had changed previous impressions, shows beyond doubt, that their minds were under the influence of no bias, one way or the other.
We think therefore, all these jurors were free from legal exception, and were properly put to the prisoner.
2. The next question is, did the court err in refusing t0 change the venue? By the act of 1827, ch. 30, all laws theretofore authorising a change of venue in criminal cases, were repealed, and it is provided, that upon oath being made by a person charged with a crime, that there exists too great an excitement to his prejudice, to come to trial at the first term, the cause shall be continued for one term only, “provided that when any criminal case shall be pending before any of the courts, and the judge presiding, shall, upon an attempt to select and empannel a jury for the trial of said criminal or criminals, be of opinion that a fair and impartial trial cannot be had in the county where such trial is attempted to be had, such Judge shall and may have it in his power to change the *237 venue of said cause to the next adjoining county convenient to the parties; Provided, The accused agree thereto.”
Before the passage of this law, a change of venue was had, upon the application of the prisoner, and the policy was, to permit the prisoner to insist on a trial in the county where the offence was committed, or if there was prejudice against him, to apply for a change of revenue at his election. But the act of 1827, introduced an entirely different policy. It takes away from a defendant in a criminal prosecution, all right to apply for a change of venue, and requires the trial to be had in the county where the offence was committed, if an impartial trial can be had. If, in the opinion of the Judgé, after an attempt to select and empannel a jury, an impartial trial cannot be had, such judge may change the venue to some other county, provided the accused agree thereto. The judge must act upon his own opinion, formed upon an attempt to empannel a jury, as to whether an impartial trial can be had. The prisoner has no right to his motion for a change of venue. The only action on his part, that the statute contemplates, is, an assent to the change of venue, after the judge shall have determined such change to be proper.
The disregard of his affidavit, and overruling his motion for a change of venue in this case, was not, therefore erroneous.
But it is urged, that the record shows a state of facts, upon which the court should have acted, and have ordered a change of venue ; and that not having done so, he erred, and this court should reverse the judgment.
The only facts upon this record, which shed light upon this subject, are the following: The trial commenced one Tuesday, and a jury was not made up until Friday; and during the effort to get a jury, two hundred and twelve men had been summoned, all of whom had formed opinions, except the twelve selected for the panel, and the thirty-five who were challenged peremptorily by the prisoner. It is true the pri *238 soner states facts, in Ms affidavit, of the misbehavior of the jurors, in the expression of opinions, and that there was great excitement and prejudice against him. But this affidavit does not prove the existence of the facts it contains. They are not verified by the bill of acceptions. All that the bill of exceptions verifies, is, that this affidavit was made, and read to the court, as the foundation of the motion for a change of venue.
Unquestionably, the length of time occupied in forming a panel, and the number of jurors summoned, from whom to select it, would have justified a change of venue, if the judge has ordered it. But these facts, did not produce, in his Hon- or’s mind the opinion, that an impartial trial could not be had; and he persevered in his effort to get a jury. Now, how can we say, that the facts disclosed in this record, must have convinced the judge, that an impartial trial could not be had?
We cannot say that those facts would have convinced our own minds, that such a trial might not be had.
In forming the opinion required by the statute, the mere facts, of the delay of several days in getting a jury, and that, of two hundred and twelve men who were summoned, one hundred and sixty-five had formed opinions, would not, necessarily bring the mind to that result. Much must be seen, and understood by the judge, of facts as they transpire in the court room, that will have the effect of impressing his mind with the conviction, as to whether an impartial trial can be had. It may be, therefore, that such other facts existed, than those set forth in this record, as fully justified the judge in refusing to change the venue.
Indeed, it is difficult to perceive how a case could exist, where this court could say, the circuit judge had erred, in not changing the venue under this statute.
The law declares, that in order to authorize the change *239 of venue, the judge must, after an attempt to empannel a jury, be of opinion that an impartial trial cannot he had.
The matter is left to the discretion of the circuit judge, in such way, as to make it extremely difficult, in any case, to revise his judgment, and say he has erred ; but we will not say his discretion may not he controlled by this court.
It turns out, that a jury was obtained, and from aught that appears, one above exception, and one before whom an impartial trial was had.
With such a result, of his persevering effort to get a jury we are called upon to say, that, before it was obtained, he ought to have been of opinion, that no such impartial jury could be had; and inasmuch as he was not of that opinion, we ought to reverse his judgment. We think this cannot be done.
3rd. It is next insisted that the defendant is not guilty of murder; but is, at most, only guilty of manslaughter.
The deceased, who was slain by the defendant, was his master. The proof shows that he was a kind, and humane master, though a man of firm, and decided character. The defendant is a boy just arriving at manhood, and had been raised by the deceased. He had been treated humanely, having been whipped by his master but once before the day of the murder.
About a year before the murder, the defendant had disobeyed the deceased, who being about to correct him, he ran off in presence of his master, and remained out several weeks. When he went home, he was nearly starved, and greatly emaciated. After he had been at home sometime, and had recovered his health, the deceased whipped him, somewhat severely, but not cruelly.
A short time before the murder, the prisoner had run away again, and remained out some weeks. The Sunday night week before the deceased was killed, the defendant, (being *240 then runaway,) went to Mi\ Brown’s, and told bis slave Ira, that he was going home, and if his master got him in a close place, and he could not get out, he would knock him down and kill him, before he would be beaten as he had been. Defendant said when he ranaway before, the deceased took his shirt off and whipped him a good deal; he punished him more than he would ever be punished again for nothing.
The defendant went home, and for several days the deceased forebore to chastise him. On the morning of the murder, the slaves of the deceased were employed in building a rock fence. The defendant was engaged in hauling rock. He had broken one ox-bow that morning, and the deceased sent him to borrow another. In driving down a hill, one of the keys came out of an ox-bow, and the ox was released from the yoke. While the defendant and another man were engaged in yoking the ox, the deceased came up, and took hold of the defendant, and ordered two slaves to hold him. He sent for a lock, and when it was brought, locked a log chain around the defendant’s leg, and sent him to the quarry to work, striking him several blows with the ox switch as he went off.
The deceased then went to the house and got a rope; he tied a piece of leather seven inches long, and three inches wide to a handle, and left them at the stable. He then went to the quarry, and commanded the defendant to follow him, which he did, taking a mattock, and large knife along. As the two went on towards the stable, the defendant struck the deceased on the head with the mattock, and repeated his blows, giving five wounds on the head, each of which would have been fatal; and then, inflicted four stabs in his breast with the knife.
After the killing, the defendant went back to where the other slaves were at work and told them he had killed his *241 master. When asked why he had done it ? he replied, he was obliged to do it.
Upon this statement of the case, (and we regard the proof as establishing the facts above stated,) the killing was clearly murder.
It is argued, that the defendant was alarmed at the character of the preparation for his punishment, and under the fear and apprehension of death, or great bodily harm, he inflicted the fatal blows ; and that there is not evidence of malice.
It must be manifest, we think, that the prisoner could not have apprehended anything more than the chastisement, usually inflicted on slaves for such delinquences. Certainly nothing more was intended by the deceased. The instrument he had prepared, was not calculated to inflict wounds, or in any way to disable the party to be chastised.
And the treatment of the deceased towards his slaves, afforded no ground for the belief, that he was about to put the life of the defendant in jeopardy.
But when we remember the threat uttered by the defendant to Mr. Brown’s Ira, that if he got in a close place, he would kill his master; and the fact, that he armed himself deliberately with the mattock and knife, there is conclusive evidence of the most deliberate and malicious purpose.
4th. There is no error in the charge of the court to the jury.
The question, whether the killing were murder, or manslaughter, or excusable self defence, was submitted to the jury upon the evidence, with instructions as to the law, in every respect favorable to the prisoner’s defence.
Upon the whole, we think there is no error in the judgment, and order that it be affirmed.